☑ Original        ☐ Dup 



CLERK'S OFFICE
A TRUE COPY
Aug 07, 2023
S/ JDU
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

### for the

### Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | **23-M-423 (SCD)** |
| *(Briefly describe the property to be searched* | ) | |
| *or identify the person by name and address)* | ) | Case No. |
| Cellular telephone assigned call number (414) | ) | **Matter No.: 2023R00139** |
| 737-6433 in the custody/control of AT&T and all of | ) | |
| its subsidiaries and affiliates (See Attachments) | ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A; over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before    8-21-23    *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to      Hon. Stephen C. Dries      .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for _____ days *(not to exceed 30)*    ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:    8-7-23. 2:30 pm _____     *Stephen C. Dries* (signature)
                                                                *Judge's signature*

City and state:    Milwaukee, WI _____     Hon. Stephen C. Dries, U.S. Magistrate Judge
                                                       *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1.      The cellular telephone assigned call number **(414) 737-6433** (referred to herein and in Attachment B as "Target Cell Phone 1"), that is in the custody or control of **AT&T and all of its Subsidiaries and Affiliates** (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 11760 US Highway 1, North Palm Beach, FL 33408. Records and information associated with the Target Cell Phone 1 that are within the possession, custody, or control of **AT&T and all of its Subsidiaries and Affiliates**.

2.      The cellular telephone assigned call number **(414) 295-3052** (referred to herein and in Attachment B as "the Target Cell Phone 2"), that is in the custody or control of **T-MOBILE/METRO PCS** (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 4 Sylvan, Parsippany, NJ 07054. Records and information associated with the Target Cell Phone 2 that are within the possession, custody, or control of **T-MOBILE/METRO PCS**.

3.      The cellular telephone assigned call number **(414) 250-2172** (referred to herein and in Attachment B as "the Target Cell Phone 3"), that is in the custody or control of **T-MOBILE/METRO PCS** (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 4 Sylvan, Parsippany, NJ 07054. Records and information associated with the Target Cell Phone 2 that are within the possession, custody, or control of **T-MOBILE/METRO PCS**.

26

## ATTACHMENT B

### Particular Things to be Seized

I. **I. Information to be Disclosed by the Provider**

All information about the location of the Target Cell Phone 1, Target Cell Phone 2, and Target Cell Phone 3 described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone 1, Target Cell Phone 2, and Target Cell Phone 3" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A. This information also includes: (i) any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN; (ii) Source and destination telephone numbers; and (iii) date, time, and duration of communication.

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A, and the following information about the customers or subscribers associated with the Target Cell Phone 1, Target Cell Phone 2, and Target Cell Phone 3 for the time period January 1, 2019, through the present:

    i.  Names (including subscriber names, usernames, and screen names);

    ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

27

iii.   Local and long-distance telephone connection records;

iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.   Length of service (including start date) and types of service utilized;

vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T and all of its Subsidiaries and Affiliates and T-MOBILE/METRO PCS is required to disclose the Location Information to the government. In addition, AT&T and all of its Subsidiaries and Affiliates and T-MOBILE/METRO PCS must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T and all of its Subsidiaries and Affiliates and T-MOBILE/METRO PCS's services, including by initiating a signal to determine the location of the Target Cell Phone 1, Target Cell Phone 2, and Target Cell Phone 3 on AT&T and all of its

28

Subsidiaries and Affiliates and T-MOBILE/METRO PCS's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T and all of its Subsidiaries and Affiliates and T-MOBILE/METRO PCS for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.     Information to Be Seized by the Government

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of suspected firearms trafficking/straw purchasing activity during the relevant time period by ADAMS, DONELSON, TUCKER, and others.

All information described above in Section I that will assist in locating ADAMS, DONELSON, and TUCKER.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.

29



CLERK'S OFFICE
A TRUE COPY
Aug 07, 2023
S. DRIE
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

Cellular telephone assigned call number (414)
737-6433 in the custody/control of AT&T and all of its
subsidiaries and affiliates (See Attachments)

)
)
)
)
)
)

Case No.

## 23-M-423 (SCD)

## Matter No.: 2023R00139

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A; over which this Court has jurisdiction pursuant to 18 U.S.C. §§ 2703 and 2711 and Federal Rule of Criminal Procedure 41.

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C § 371; 922(a)(6); and 924(a)(1)(A) | Possession or sale of firearms; Evidence of straw purchasing firearms and illegal firearms trafficking; |

The application is based on these facts:

See attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*SA Brendan Mulvey*
*Applicant's signature*

SA Brendan Mulvey, ATF
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 8-7-23

*Judge's signature*

City and state:  Milwaukee, WI

Hon. Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF
# AN APPLICATION FOR A SEARCH WARRANT
## Matter No.: 2023R00139

I, Brendan Mulvey, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A), for information about the location of the cellular telephone assigned call number **(414) 737-6433,** ("Target Cell Phone 1"), whose service provider is **AT&T and all of its Subsidiaries and Affiliates** ("Service Provider"), a wireless telephone service provider headquartered at 11760 US Highway 1, North Palm Beach, FL 33408. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A), for information about the location of the cellular telephone assigned call number **(414) 295-3052,** ("Target Cell Phone 2"), whose service provider is **T-MOBILE/METRO PCS** ("Service Provider"), a wireless telephone service provider headquartered at 4 Sylvan, Parsippany, NJ 07054. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

3.      I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A), for information about the location of the cellular telephone assigned call number **(414) 250-2172,** ("Target Cell Phone 3"), whose service provider is **T-MOBILE/METRO PCS** ("Service Provider"), a wireless telephone service provider headquartered at 4 Sylvan, Parsippany, NJ 07054. The Target Cell

Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

4.      Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), I also make this affidavit in support of an application by the United States of America for an order pursuant to 18 U.S.C §§ 3122 and 3123, authorizing the installation and use of pen registers and trap and trace devices ("pen-trap devices") to record, decode, and/or capture dialing, routing, addressing, and signaling information associated with each communication to or from the Target Cell Phone.

5.      I am a Special Agent in the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and have been so employed since June 2018. I am presently assigned to the ATF Milwaukee IV Field Office in Milwaukee, Wisconsin. I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in 18 U.S.C. § 2516. I was trained as an ATF Special Agent at the Federal Law Enforcement Training Center in Glynco, Georgia.

6.      Based on my training, experience, discussions with other law enforcement agents, and my participation in other investigations involving controlled substances, and firearms, I know that individuals involved with and/or associated to drug and firearms trafficking commonly use the social media platform Facebook to facilitate their drug and firearm trafficking activities. Like most everyone else in this day and age, drug and firearm traffickers typically have a Facebook profile and are able to access it via their computer or cellular telephone. Drug and firearm

2

traffickers commonly maintain a Facebook profile, and sometimes allow other drug and firearm trafficking associates to use their profile, to conduct criminal gang activity and/or drug and firearm trafficking business.

7.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

8.      Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Possession of a Firearm by a Convicted Felon, in violation of Title 18, United States Code, Section 922(g)(1); Engaging in the Business Without a License (Firearms), in violation of Title 18, United States Code, Section 922(a)(1)(A); False Statement During the Purchase of a Firearm, in violation of Title 18, United States Code, Section 922(a)(6) & 924(a)(1)(A), have been committed by Devantte ADAMS ("ADAMS" herein), Canisha DONELSON ("DONELSON" herein), and Quentin TUCKER ("TUCKER" herein), and others, known and unknown, as explained below.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

9.      The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined 18 U.S.C. Section 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. Section 2711(3)(A)(i).

3

**PROBABLE CAUSE**

10.     Your affiant knows, from his training and experience, that individuals who are deemed "prohibited" cannot legally purchase firearms from a Federal Firearms Licensee (FFL) because of previous felony convictions, because of a previous conviction of misdemeanor crime of domestic violence, because they are underage, or for other reasons which make them prohibited from purchasing a firearm from an FFL. Prohibited individuals who want to obtain a firearm will often recruit "straw purchasers" to illegally obtain firearms on their behalf. These "straw purchasers" are often completed with the intent to conceal the identity of the intended recipient of the firearm. These types of transactions are commonly conducted for financial gain of the "straw purchaser" or as the result of a relationship between the previously convicted felon and the original purchaser. When a firearm is recovered by law enforcement, the firearm information is generally submitted for tracing information. This tracing information can help to identify the origin of the firearm. A common indicator of a firearm straw purchase can be the existence of a relatively short time span between the purchase of a firearm and its ultimate recovery by law enforcement during a crime or as part of a criminal investigation. Under these circumstances, the short "time to crime" (TTC) serves as an investigative lead.

11.     On or about April 3, 2023, your affiant was contacted by an employee from Federal Firearms Licensee (FFL) Select Fire Weaponry, located at 2325 Park Lawn Dr., Unit B, Waukesha, WI 53186, regarding suspicious purchase activity being made by DEVANTTE ADAMS. The employee stated ADAMS attempted to purchase a Glock, model 43, 9mm caliber pistol, but the transaction was denied due to the FFL's suspicion that ADAMS was engaged in illegal activity. The employee stated that they had previously received multiple trace requests from ATF in which ADAMS was found to be the original purchaser of a recovered firearm. This ultimately fueled

4

their decision to no longer sell firearms to ADAMS. The employee also informed your affiant that two [2] vehicles were with ADAMS when he arrived at the store and ADAMS entered the business with an unknown female. The employee stated that another unidentified individual waited outside while ADAMS was inside the store. Your affiant observed this activity to be consistent with an attempted straw-purchase of a firearm. Once the sale was denied, ADAMS and the two [2] unknown vehicles departed the area without further incident.

12.     Your affiant conducted a query of ATF's eTrace system for firearm trace reports and multiple sale reports that were associated to ADAMS. The query revealed that ADAMS was connected to eleven firearm trace reports and two multiple sale reports. The following is a synopsis of the trace and multiple sale reports associated to ADAMS:

- On April 14, 2023, the Milwaukee Police Department (MPD) recovered a Glock, model 26, 9mm caliber pistol bearing serial number BSRM728 at 1607 W. Meinecke Ave, Milwaukee, WI 53206, while investigating a theft complaint. ADAMS purchased the firearm on August 19, 2021, from Select Fire Weaponry, located at 2325 Parklawn Dr., Unit B, Waukesha, WI 53186. The Time to Crime (TTC) on the firearm was 603-days.

- On March 10, 2023, the Brookfield Police Department (BPD) recovered a Ruger, Model Security-9, 9mm caliber pistol bearing serial number 381-25389 from a convicted felon during a narcotics-related incident at 375 S. Moorland Road, Brookfield, WI 53005. ADAMS purchased the firearm on October 24, 2018 from Dunham's Sports #9011, located in Brookfield, WI. The Time to Crime (TTC) on the firearm was 1,598 days.

5

- On November 23, 2022, the Milwaukee Police Department (MPD) recovered a Walther, model PDP, 9mm caliber pistol, bearing serial number FDE8209, following the commission of a crime. ADAMS purchased the firearm on March 7, 2022, from Select Fire Weaponry, located in Waukesha, WI. The TTC on the firearm was 261-days.

- On March 1, 2022, the MPD recovered a Canik55, model TP-9SF Elite, 9mm caliber pistol, bearing serial number 21BH05425 at 1932 N. 26th St, Milwaukee, WI 53208. ADAMS purchased the firearm on June 16, 2021, from Select Fire Weaponry, located in Waukesha, WI. The TTC on the firearm was 258 days.

- On October 7, 2021, the MPD recovered a FNH USA, LLC, model 509, 9mm caliber pistol, bearing serial number GKS0134669 from a convicted felon during a homicide investigation at 1837 Becher St., Milwaukee, WI 53215. ADAMS purchased the firearm on March 13, 2021, from FFL Fleet Farm, located in Germantown, WI. The TTC on the firearm was 208-days.

- On September 12, 2021, the MPD recovered a Glock, model 19, 9mm caliber pistol, bearing serial number BTPT098, following a fleeing and eluding incident at 7240 W. Grantosa Dr., Milwaukee, WI 53218. ADAMS purchased the firearm on August 28, 2021, from Select Fire Weaponry, located in Waukesha, WI. The TTC on the firearm was 15-days.

- On August 19, 2021, ADAMS purchased a Glock, model 23, .40 caliber pistol, bearing serial number BTSH142, and a Glock model 26, 9mm caliber

6

pistol, bearing serial number BSRM728 from Select Fire Weaponry, located in Waukesha, WI.

- On April 5, 2020 the MPD recovered a Taurus, model PT111 Millennium G2, 9mm caliber pistol, bearing serial number TKS34439 following a narcotics-related crime that occurred at 128 W. Concordia St., Milwaukee, WI 53212. ADAMS purchased the firearm on August 17, 2017, from Fleet Farm, located in Germantown, WI. The TTC on the firearm was 962-days.

- On August 15, 2019, the MPD recovered a Taurus, model PT845, .45 caliber pistol, bearing serial number NHS72260 from a convicted felon at 2412 W. Cypress St, Milwaukee, WI 53206. ADAMS Purchased the firearm on July 24, 2015, from FFL Shorty's Shooting Sports, located in West Allis, WI. The TTC on the firearm was 1,483-days.

- On January 28, 2019, the Chicago Police Department (CPD) recovered a Smith & Wesson, model SD9VE, 9mm caliber pistol, bearing serial number FXU2118, from a suspect at 4308 Augusta, Chicago, IL 60601. ADAMS purchased the firearm on May 27, 2016, from Fleet Farm, located in Germantown, WI, thus having a TTR on the firearm was 976 days. Reference ATF Trace Number: T20190140061 for complete details. The firearm was also used during two [2] previous shooting incidents in the Chicago, IL area, with the first incident occurring on December 21, 2017, thus having a TTC of 573-days. The second shooting was observed to have occurred 286-days later on October 4, 2018.

- On April 25, 2018, the MPD recovered a Sarsilmaz, model SARK2P, 9mm caliber pistol, bearing serial number T1102-16C04335 during an

7

incident that occurred at 2910 W. Capitol Dr, Milwaukee, WI 53210. ADAMS purchased the firearm on February 15, 2017, from FFL Shorty's Shooting Sports, located in West Allis, WI. The TTC on the firearm was 434-days.

- On June 4, 2017, MPD recovered a CBC, model 715B, .22 caliber pistol, bearing serial number EMJ3947672 during a narcotics-related offense that occurred at 2931 N 19th St, Milwaukee, WI 53206. ADAMS purchased the firearm on March 16, 2017, from FFL Gander Mountain #12, located in the Eastern District of Wisconsin, thus having a TTC of 82-days.

- On May 27, 2016, ADAMS purchased a Smith & Wesson, model SD40VE, .40 caliber pistol, bearing serial number FXR7688, and a Smith & Wesson, model SD9VE, 9mm caliber pistol, bearing serial number FXU2118, form Fleet Farm, located in Germantown, WI.

13.    ATF identified five [5] additional firearms purchased by ADAMS which have not yet been recovered. The purchases and the dates that they occurred are detailed as follows:

- November 9, 2018: Carl Walther, model PK380, .380 caliber pistol, bearing serial number WB145269 (Mill's Fleet Farm)

- August 15, 2020: Canik, model TP9SF, 9mm caliber pistol, bearing serial number 20AT18484 (Select Fire Weaponry)

- August 18, 2021: Glock, model 23, .40 caliber pistol, bearing serial number BTSH142 (Select Fire Weaponry)

- December 17, 2021: Glock, model 43X, 9mm caliber pistol, bearing serial number BVMN320 (Select Fire Weaponry)

8

- June 23, 2022: FN, model 509M, 9mm caliber pistol, bearing serial number GKS0202115 (Select Fire Weaponry)

14. Your affiant obtained and reviewed law enforcement incident reports pertaining to firearm recoveries associated to ADAMS. Your affiant has utilized reports such as these in the past during the regular course of his duties and has found them to be truthful and reliable. While doing so, your affiant identified Milwaukee Police Incident Report 212550224, pertaining to the recovery of the Glock, model 19, 9mm caliber pistol, bearing serial number BTPT098 on September 12, 2021 (See above). This firearm was recovered during a fleeing and eluding/narcotics-related incident just fifteen [15] days after having been purchased by ADAMS from Select Fire Weaponry on August 28, 2021.

15. According to the report, while in the area of W. Glendale Ave and N. 31st St., MPD Officers observed several subjects standing in the roadway and conversing with the driver of a black 2010 Acura TL bearing WI plates AMA-7935 near/around the driver-side door. After a brief exchange, the subjects then turned and walked away from the Acura and entered a separate vehicle parked nearby. Officers recognized the interaction to be consistent with a hand-to-hand narcotics transaction and approached the Acura.

16. Officers observed the vehicle to be occupied by a single occupant driver, identified as Cornelius MILLER (DOB: xx/xx/xxxx). Upon approaching the vehicle, Officers immediately observed two [2] large clear plastic sandwich bags containing a large amount of a green leafy plant-like substance suspected to be marijuana in the vehicles cup holder area, along with two [2] large plastic vacuumed sealed style bags in the rear driver floorboard area containing a large amount of a green leafy plant like substance suspected to be marijuana. Officers also observed a

9

clear plastic corner-cut baggie containing a green leafy plant like substance suspected to be marijuana in plain view in the driver door handle.

17.     MILLER subsequently accelerated away from MPD officers, and a vehicle pursuit ensued. MILLER ultimately crashed his vehicle and was taken into custody. During a search of the vehicle, Officers located the aforementioned Glock pistol seated on the drivers-side floorboard, along with additional contraband in various locations.

18.     During a subsequent Mirandized interview, MILLER related that he was recently given the Glock by his cousins or brothers, and that they provided it to him for protection since he is selling marijuana.

19.     Your affiant then began to review recorded jail phone calls made by MILLER during his incarceration following the incident. On September 14, 2021, at approximately 1253 hours, MILLER made an outgoing telephone call to a female subject at telephone number xxx-xxx-xxxx in which he identifies ADAMS as the source of the recovered firearm. In summation MILLER stated the following: "That gun was cuz gun… the fat cuz. 'Devantte Adams' on Facebook."

20.     Your affiant received information from an offline National Crime Information Center (NCIC) query indicating that ADAMS had a firearms background check run on him subsequent to his attempted purchase at Select Fire Weaponry. Your affiant also identified ADAMS to have approximately twenty-seven [27] presumed background checks during firearms purchases run on him through the Wisconsin Department of Justice (DOJ) Firearms Terminal between July 24, 2015, to April 3, 2023. Your affiant then contacted an employee of FFL Dunham's Sports to inquire of any firearms purchased by ADAMS from any of their store locations. Upon doing so, your affiant identified ADAMS to have purchased a Glock, model 43X,

10

9mm caliber pistol, bearing serial number BZRM347, from Dunham's Sports, located at 18200 W. Bluemound Rd, Brookfield WI 53045, on April 3, 2023.

21.     Upon receiving this information, your affiant was made aware of an additional purchase made by ADAMS from Dunham's Sports located in Brookfield, WI, of a Ruger, model Security-9, 9mm caliber pistol, bearing serial number 381-25389. This firearm was previously identified by ATF as having been recovered by law enforcement in the possession of a convicted felon on March 10, 2023 (See above).

22.     As part of this investigation, your affiant obtained and reviewed security footage that recorded ADAMS visit to Select Fire Weaponry and Dunham's Sports on April 3, 2023. Upon reviewing the footage from Select Fire Weaponry, your affiant observed ADAMS arrive at the store at approximately 1653 hours, as the passenger of a silver in color Ford Focus with a black decal along the sides ("SV-1" herein). Your affiant also observed a silver in color unknown model, Chevrolet sedan, with a hubcap missing from the front passenger-side wheel ("SV-2" herein) to have also arrived with and park directly behind SV-1 in the Select Fire Weaponry lot.

23.     Upon parking, a heavy-set black male wearing multi-colored hooded sweatshirt and gray sweatpants, identified as ADAMS, is observed exiting the front passenger seat of SV-1 and walking towards SV-2 and entering the rear passenger seat along the vehicle's drivers-side. Moments later, ADAMS is observed exiting the rear passenger seat of SV-2 and begins walking towards the stores front entrance. An unknown heavy-set black female with long hair, wearing a multi-colored jacket/hooded sweatshirt, gray sweatpants, and carrying a beige purse ("Unknown Female-1" herein) is then observed exiting the driver's seat of SV-2 and walking behind ADAMS towards the stores front entrance. At approximately 1656 hours an additional unknown female with

11

her hair tied up, wearing a gray hooded sweatshirt and black pants ("Unknown Female-2" herein) is observed exiting SV-2 and walking towards the stores front entrance.

24.     Adams and "Unknown Female-1" and "Unknown Female-2" appeared to have traveled together to the FFL and appeared to confer on what types of firearms to purchase.

25.     Your affiant then reviewed footage obtained from Dunham's Sports that captured ADAMS purchase. The recording beings at approximately 1757 hours showing ADAMS standing at the gun counter with the aforementioned unknown females. All three [3] subjects appear to be peering through the display case/gun counter at various handguns on display.

26.     ADAMS was observed completing firearm purchase paperwork. At approximately 1831 hours, ADAMS is observed at the cash register area meeting with the store associate who is carrying what appears to be a black/dark in color gun box housing the aforementioned Glock, model 43X, 9mm caliber pistol, bearing serial number BZRM347. The associate is observed scanning what appears to be a box of Blazer brand 9mm caliber ammunition. ADAMS is then observed removing what appears to be US currency from his pocket. Moments later, ADAMS and Unknown Female-1 are observed exiting the store while Unknown Female-2 waits near the register. ADAMS and Unknown Female-1 are observed returning inside the store and approaching the register. ADAMS then begins counting a sum of currency in front of the store associate. The associate then collects and counts the currency and places it inside the register. As this is happening, Unknown Female-1 can be seen looking at/scrolling on her cell phone.

27.     ADAMS and the unknown females are then observed exiting the store. Your affiant recognized the incident at Select Fire Weaponry and Dunham's Sports to be consistent with a straw purchase of a firearm.

12

28.     As part of this investigation, your affiant submitted photographs of the unknown females who accompanied ADAMS during the purchase of the Glock. Upon doing so, your affiant received a correlation between Unknown Female-1 and Canisha DONELSON (DOB: xx/xx/xxxx). A check of DONELSON's criminal history revealed her to have been previously convicted of a felony in the state of Wisconsin for Possession with Intent to Distribute Heroin (Party to a Crime), related to Milwaukee County Case Number 2017CF000284, and Forgery-Alter Value of Object/Theft, related to Milwaukee Count Case Number 2006CF001469.

29.     While reviewing transaction paperwork completed by ADAMS during the above detailed purchase, your affiant observed him to have provided a telephone number of (414) 737-6433 as his point of contact alongside his signature at the bottom of Section 1 of the Wisconsin (WI) Department of Justice (DOJ) Firearms Dealer Notification (Handgun Transfers) form. Your affiant identified the service provider for the listed number to be AT&T Mobility. Your affiant then obtained a United States Grand Jury Subpoena for subscriber information and toll records associated to the number provided by ADAMS. These records were then received by your affiant on June 6, 2023. Upon reviewing the Subscriber Information section of the return, your affiant observed the telephone number to be active with an activation date of February 18, 2023. While reviewing call detail records associated with the telephone number, your affiant observed ADAMS to have been in communication with telephone number **(414) 295-3052** numerous times leading up to his attempted firearm purchase from Select Fire Weaponry on April 3, 2023. Your affiant conducted a check of the telephone number for unofficial subscriber information using law enforcement databases and observed DONELSON to list as the likely user. Your affiant observed the last contact between ADAMS and DONELSON prior to their arrival at Select Fire Weaponry to have occurred at approximately 1528 hours. As previously stated, ADAMS and DONELSON

13

arrived at Select Fire Weaponry at approximately 1653 hours and departed at approximately 1715 hours. Your affiant observed ADAMS telephone to have engaged in numerous cellular data sessions while at Select Fire Weaponry. Your affiant believes the data sessions to be indicative of usage of an internet-based application system such as Facebook, Instagram, etc. Your affiant is aware that cellular data enables mobile devices to access the internet when they are not connected to a Wi-Fi network. Your affiant is also aware that internet-based applications such as Facebook and Instagram have messaging features such as "Messenger", which is an application that allows users to communicate and send messages between one another.

30.     On April 3, 2023, at approximately 1738 hours, ADAMS then made an outgoing telephone call to telephone number **(414) 250-2172**. A query of the telephone number through law enforcement databases revealed the unofficial subscriber to be Quentin TUCKER (DOB: xx/xx/xxxx). Approximately one minute later, ADAMS then received an incoming call from TUCKER, which then concluded at approximately 1744 hours. Your affiant observed the call to last a duration of approximately four minutes and forty-five seconds. It is important to note that these calls made/received by ADAMS from DONELSON and TUCKER occurred following ADAMS and DONELSON's departure from Select Fire Weaponry and before their arrival at Dunham's Sports.

31.     As part of this investigation, your affiant then conducted a routine background check of TUCKER and observed him to have been previously convicted of a felony offense in the state of Wisconsin for Possession with Intent to Distribute Cocaine, related to Milwaukee County Case Number 2001CF005651. Your affiant also observed TUCKER to have been convicted in 2009 of Federal cocaine possession and distribution charges in the Eastern District of Wisconsin. TUCKER also currently has an open felony case in Milwaukee County for numerous narcotics-

14

related charges to include Possession with Intent to Distribute Heroin (Party to a Crime (PTAC)), Possession with Intent to Distribute Cocaine (PTAC) (x2) and Maintain a Drug Trafficking Place (PTAC) (x2), related to Milwaukee County Case Number 2020CF002778.

32.     While reviewing TUCKER's residential history, your affiant observed he and DONELSON to have two common addresses, with a previous address of 5749 N 62nd St, Apt 2, Milwaukee, WI 53218, and a possible current address of 4438 N 44th St, Milwaukee, WI 53218. Your affiant subsequently conducted utilities check of 4438 N 44th St. and observed DONELSON to list as the current resident.

33.     Also, while reviewing recorded jail telephone calls made by TUCKER during periods of incarceration in Milwaukee County between 2019 and 2021, your affiant observed numerous telephone calls made by TUCKER to DONELSON. Based on a review of the telephone calls, your affiant believes the context of the conversations to be indicative of a relationship between TUCKER and DONELSON.

34.     Continuing in June 2023, your affiant conducted surveillance operations of 4438 N. 44th St., Milwaukee, WI 53218. On June 13, 2023, at approximately 2150 hours, your affiant observed a silver in color Chevrolet Malibu with WI registration plate AMB-4584 set against the vehicles rear windshield, parked directly across the street from the residence on the west side of N. 44th St. facing Southbound. Your affiant conducted a check of the registration via the WI DOT and observed the registered owner of the vehicle to be DONELSON, with an address of 4438 N. 44th St., Milwaukee, WI 53218. Your affiant observed this vehicle to be the same as the one utilized by DONELSON on the date of ADAMS purchase of the Glock, model 43X pistol, on April 3, 2023.

15

35.     ATF also investigated financial applications utilized by ADAMS, DONELSON, and TUCKER. Upon doing so, your affiant identified a Cash App account belonging to DONELSON bearing "$Cashtag" $montaemom, with associated telephone number **(414) 295-3052**. Your affiant also identified an additional Cash App account belonging to TUCKER bearing "$Cashtag" $playafly26, with associated telephone number **(414) 250-2172**. Cash App explains a $Cashtag is a unique identifier for individuals and businesses using Cash App which automatically creates a shareable URL allowing other Cash App users to privately send and receive payments to and from a specific account. ATF then obtained a United States Grand Jury subpoena for subscriber/transaction records associated with the aforementioned accounts. Upon reviewing the data, your affiant observed TUCKER and DONELSON to have engaged in multiple Cash App transactions between one another on March 31, 2023, in which TUCKER transferred a total of $630.00 USC to DONELSON. It is important to note that these transactions occurred just four [4] days prior to ADAMS April 3, 2023, purchase of the Glock pistol from Dunham's Sports in the presence of DONELSON. Furthermore, ADAMS purchased the firearm for $575.38 USC utilizing cash.

36.     Your affiant then reviewed previously obtained historical telephone records for ADAMS cellular device, **(414) 737-6433**, for any communication between him and DONELSON/TUCKER around the times of the aforementioned transactions on March 31, 2023. Upon doing so, your affiant observed ADAMS to have engaged in seven [7] successful telephone calls with TUCKER's cellphone, **(414) 250-2172**, on March 31, 2023, with many of the calls occurring around the time of the Cash App transfers between TUCKER and DONELSON's cellphone, **(414) 295-3052**. Additionally, TUCKER was observed to be the second most contacted telephone number by ADAMS on this date. Additionally, ADAMS engaged in five [5] successful

16

voice calls with DONELSON on this date. Your affiant observed the amount transferred by TUCKER to DONELSON to be consistent with the purchase price of the Glock pistol bought by ADAMS on April 3, 2023. Your affiant also believes the communications observed on this date to be indicative of the three [3] subjects orchestrating a firearm straw purchase.

## FACEBOOK USAGE

37.     Through the course of this investigation, your affiant began investigating social media accounts utilized by the aforementioned suspects. Upon doing so, your affiant identified a Facebook account user by username "Devantte ADAMS" bearing Facebook ID: 1002382393, with a display picture of a heavy-set black male adult whom your affiant recognized to be ADAMS. Your affiant then began to review publicly viewable information on ADAMS Facebook page.

38.     Your affiant then began reviewing individuals who reacted to a post made by ADAMS to his account and identified a Facebook account with user/display name "Monique Montae", bearing Facebook ID: ": 100065705853482, with a display picture of a heavy-set black female adult whom your affiant believed to be DONELSON. Your affiant then conducted a query of Facebook for users named "Canisha Donelson" and identified an additional account bearing Facebook ID: 100068896616603. Your affiant observed the individual pictured in the profile's display picture to be a heavy-set black female adult, whom your affiant also believed to be DONELSON. Your affiant observed the picture to depict a black female wearing a white shirt with red/white lettering that appears to read "Make Money Not Friends" and was posted to the account on June 9, 2021. Your affiant also observed the picture to contain an over-head caption that reads "MONTAE MOM". Your affiant then cross-referenced the picture to a photograph posted to "Monique Montae's" account on June 6, 2021, which shows the same black female wearing the same shirt that appears to read "Make Money Not Friends". Your affiant observed these

17

individuals to be one and the same. Your affiant therefore concluded both accounts to be utilized by DONELSON.

39.     While reviewing publicly viewable information on DONELSON's Facebook account under username "Monique Montae", your affiant identified numerous photographs depicting DONELSON and ADAMS together. Your affiant also identified a photograph posted to the account on June 19, 2022, depicting DONELSON with an adolescent black male as well as and a black male adult wearing a black doo-rag, black shirt, and red shorts. Your affiant also observed a caption posted alongside the photograph that reads: "HAPPY FATHERS DAY TO MY ONE AND ONLY BD [Heart emoji] I DON'T CARE WHAT YOU THINK OF HIM HE A FATHER TO THIS ONE [Flexing emoji] **Ball Onem** MONTAE DAD ONE SON ONE BD [Check mark emoji]" (See Figure 2). Your affiant is aware that "BD" is an acronym used to indicate "Baby Daddy". Your affiant is also aware that "Baby Daddy" is common vernacular used to reference the father of one's child. Your affiant also observed an additional Facebook account to be "tagged" in the caption bearing the username "Ball Onem" with associated Facebook ID: 100077749593823. Your affiant is aware that "tagging" is a Facebook feature that enables users to mention/label other users when they are referenced in a post/pictured in a photograph. This also notifies the "tagged" user that they were pictured/their account was mentioned by another Facebook users account. Your affiant then compared the black male adult pictured in DONELSON's photograph with TUCKER's WI state-issued driver's license image and surmised that the two individuals were the same. Your affiant therefore concluded TUCKER to be the user of the tagged Facebook account "Ball Onem". Your affiant then began to review publicly viewable information on TUCKER's account. Your affiant subsequently observed ADAMS account listed in the "Friends" section of TUCKER's account, further establishing the two [2] to be associated.

18

## CONCLUSION

40.     To date, ATF has identified sixteen [16] firearms purchased by ADAMS in which eleven [11] have been recovered by law enforcement in relation to a criminal investigation. Your affiant believes based on his training, knowledge, and experience that the frequency in which the firearms purchased by ADAMS have been recovered following a crime are indicative of firearms trafficking/straw purchasing.

41.     As part of this investigation, your affiant obtained and reviewed purchase documents completed by ADAMS during many of the above identified firearms purchases to include ATF Form's 4473 and WI DOJ Firearms Dealer Notification (Handgun Transfers) forms. While reviewing the ATF Form's 4473, your affiant observed ADAMS to mark "Yes" when answering question 11. a. located in Section A/21. a. located in Section B on each form, which asks, "Are you the actual transferee/buyer of the firearm(s) listed on this form?" The question also warns the purchaser in bold lettering that they are not the actual transferee/buyer if they are acquiring the firearm(s) on behalf of another person. Notably, your affiant observed ADAMS to have initially answered "No" when answering this question during his May 26, 2016, purchase of the two [2] above detailed Smith & Wesson pistols from FFL Mills Fleet Farm. ADAMS then revised his response by drawing a line through his answer, and then marking "Yes", claiming to be the true purchaser. Your affiant also observed ADAMS to mark "No" on each form when answering all additional questions regarding whether the various prohibiting factors of firearm possession apply to him. It should also be noted that the ATF Form 4473 has undergone numerous revisions between ADAMS initial firearm purchase and his most recent purchase on April 3, 2023; and that question 21. a. located in Section B on the current form was previously identified as question 11. a. of Section A on previous forms.

19

42.     Your affiant also observed ADAMS to have signed each form, certifying that the information provided was true, correct, and complete. Also, by signing, ADAMS declared that he read and understood the Notices, Instructions, and Definitions on the ATF Form 4473, and that by falsely answering "yes" to Section A, question 11. a./Section B, question 21. a., claiming to be the true/actual transferee/buyer is a crime punishable as a felony under Federal law, and may also violate State and/or local law. Furthermore, ADAMS understood that making any false oral or written statement or exhibiting any false or misrepresented identification with respect to the transactions, is a crime punishable as a felony under Federal law and may also violate state and/or local law. Lastly, ADAMS understood that "the repetitive purchase of firearms for the purpose of resale and profit without a federal firearms license is a violation under Federal law."

43.     Based on the above information, it is believed that ADAMS is currently utilizing cellular number **(414) 737-6433** (Target Cell Phone 1) and locating that cellular phone will assist in determining ADAMS's location, as well as the location of additional evidence of the alleged criminal activity. Law enforcement databases show the Target Cell Phone 1's number **(414) 737-6433** to be affiliated with **AT&T Mobility** (the "Service Provider").

44.     Based on the above information, it is believed that DONELSON is currently utilizing cellular number **(414) 295-3052** (Target Cell Phone 2) and locating that cellular phone will assist in determining DONELSON's location, as well as the location of additional evidence of the alleged criminal activity. Law enforcement databases show the Target Cell Phone 2's number **(414) 295-3052** to be affiliated with **T-MOBILE/METRO PCS** (the "Service Provider").

45.     Based on the above information, it is believed that TUCKER is currently utilizing cellular number **(414) 250-2172** (Target Cell Phone 3) and locating that cellular phone will assist

20

in determining TUCKER's location, as well as the location of additional evidence of the alleged criminal activity. Law enforcement databases show the Target Cell Phone 3's number **(414) 250-2172** to be affiliated with **T-MOBILE/METRO PCS** (the "Service Provider").

<u>**BACKGROUND FOR SERVICE PROVIDERS**</u>

46.　　In my training and experience, I have learned that **AT&T Mobility** and **T-MOBILE/METRO PCS** (the "Service Provider") are companies that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half- mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

47.　　Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone 1, 2, and 3. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers

21

such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

48.     I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase II data about the location of the Target Cell Phone 1, 2, and 3, including by initiating a signal to determine the location of the Target Cell Phone 1, 2, and 3 on the Service Provider's network or with such other reference points as may be reasonably available.

49.     Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber

22

Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

50. Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

51. Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

52. I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

53. I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the

23

information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone 1, 2, and 3 on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

54.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until 30 days after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone 1 and 2 would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

55.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night. I further request that the Court authorize execution of the warrant at any time of day or night, owing to the potential need to locate the

24

Target Cell Phone 1, 2, and 3 outside of daytime hours.

## ATTACHMENT A

### Property to Be Searched

1.      The cellular telephone assigned call number **(414) 737-6433** (referred to herein and in Attachment B as "Target Cell Phone 1"), that is in the custody or control of **AT&T and all of its Subsidiaries and Affiliates** (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 11760 US Highway 1, North Palm Beach, FL 33408. Records and information associated with the Target Cell Phone 1 that are within the possession, custody, or control of **AT&T and all of its Subsidiaries and Affiliates**.

2.      The cellular telephone assigned call number **(414) 295-3052** (referred to herein and in Attachment B as "the Target Cell Phone 2"), that is in the custody or control of **T-MOBILE/METRO PCS** (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 4 Sylvan, Parsippany, NJ 07054. Records and information associated with the Target Cell Phone 2 that are within the possession, custody, or control of **T-MOBILE/METRO PCS**.

3.      The cellular telephone assigned call number **(414) 250-2172** (referred to herein and in Attachment B as "the Target Cell Phone 3"), that is in the custody or control of **T-MOBILE/METRO PCS** (referred to herein and in Attachment B as the "Service Provider"), a wireless communications service provider that is headquartered at 4 Sylvan, Parsippany, NJ 07054. Records and information associated with the Target Cell Phone 2 that are within the possession, custody, or control of **T-MOBILE/METRO PCS**.

26

**ATTACHMENT B**

**Particular Things to be Seized**

I.      I.   **Information to be Disclosed by the Provider**

All information about the location of the Target Cell Phone 1, Target Cell Phone 2, and Target Cell Phone 3 described in Attachment A for a period of thirty days, during all times of day and night. "Information about the location of the Target Cell Phone 1, Target Cell Phone 2, and Target Cell Phone 3" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information, as well as all data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the cellular telephone described in Attachment A. This information also includes: (i) any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN; (ii) Source and destination telephone numbers; and (iii) date, time, and duration of communication.

To the extent that the information described in Attachment A is within the possession, custody, or control of the Service Provider, including any information that has been deleted but is still available to the Service Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A, and the following information about the customers or subscribers associated with the Target Cell Phone 1, Target Cell Phone 2, and Target Cell Phone 3 for the time period January 1, 2019, through the present:

        i.   Names (including subscriber names, usernames, and screen names);

       ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

27

iii. Local and long-distance telephone connection records;

iv. Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v. Length of service (including start date) and types of service utilized;

vi. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii. Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii. Means and source of payment for such service (including any credit card or bank account number) and billing records.

To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of AT&T and all of its Subsidiaries and Affiliates and T-MOBILE/METRO PCS is required to disclose the Location Information to the government. In addition, AT&T and all of its Subsidiaries and Affiliates and T-MOBILE/METRO PCS must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with AT&T and all of its Subsidiaries and Affiliates and T-MOBILE/METRO PCS's services, including by initiating a signal to determine the location of the Target Cell Phone 1, Target Cell Phone 2, and Target Cell Phone 3 on AT&T and all of its

28

Subsidiaries and Affiliates and T-MOBILE/METRO PCS's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate AT&T and all of its Subsidiaries and Affiliates and T-MOBILE/METRO PCS for reasonable expenses incurred in furnishing such facilities or assistance.

This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

II.    **Information to Be Seized by the Government**

All information described above in Section I that constitutes fruits, evidence, and instrumentalities of suspected firearms trafficking/straw purchasing activity during the relevant time period by ADAMS, DONELSON, TUCKER, and others.

All information described above in Section I that will assist in locating ADAMS, DONELSON, and TUCKER.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Service Provider in order to locate the things particularly described in this Warrant.